IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | | |
|---|---|---|
| THE UNITED STATES OF AMERICA | § | |
| FOR THE USE AND BENEFIT OF | § | |
| JOHN PAQUIN D/B/A ARMADILLO | § | |
| CONSTRUCTION, | § | |
|     *Plaintiff* | § | |
| | § | CIVIL ACTION NO. 5:15-cv-00081 |
| v. | § | |
| | § | |
| INSURANCE COMPANY OF THE | § | |
| STATE OF PENNSYLVANIA, | § | |
|     *Defendant.* | § | |

**<u>INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA'S THIRD PARTY COMPLAINT AGAINST CRIDER AMERICAS SOLAR, LLC AND DSCH CAPITAL PARTNERS D/B/A FAR WEST CAPITAL; AND COUNTERCLAIM AGAINST JOHN PAQUIN D/B/A/ ARMADILLO CONSTRUCTION</u>**

Pursuant to Rules 13 and 14 of the Federal Rules of Civil Procedure, Insurance Company of the State of Pennsylvania ("ICSP" or "Defendant" or "Surety") brings this third-party complaint against Crider Americas Solar, LLC ("Crider"), third-party complaint against DSCH Capital Partners d/b/a Far West Capital ("Far West"), and counterclaim against John Paquin d/b/a Armadillo Construction ("Paquin") and respectfully shows the Court as follows:

**<u>PARTIES</u>**

1.      Crider is a Texas limited liability company in good standing and authorized to do business in the state of Texas, with its principal place of business in Cedar Creek, Texas.

2.      Paquin is an individual domiciled in the State of Texas. He may be served with process at his principal place of business, located at 126 Walnut Creek Cove, Bastrop, Texas 78602, or wherever he may be found.

3.      Far West is a Texas limited liability company in good standing and authorized to do business in the state of Texas, with its principal place of business in Travis County, Texas.

## JURISDICTION

4.      Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over the disputes between ICSP and Crider, Far West, Paquin. ICSP's claims are so related to the claims in the main action that they form part of the same case or controversy.

## VENUE

5.      Venue is proper under the general doctrine of pendent venue. Venue is also independently proper under 28 U.S.C. § 1391(b)(1) because the Western District of Louisiana is the judicial district in which Paquin and Crider performed the work which is subject to this litigation and thus they are subject to the Court's personal jurisdiction

## FACTUAL BACKGROUND

**A.      ICSP is Hypower, Inc's Surety**

6.      Hypower, Inc ("Hypower") is a corporation incorporated under the laws of the State of Florida, with its principal place of business in Fort Lauderdale, Florida. It served as the General Contractor on the Overton Brooks VA Solar Project located in Shreveport, Louisiana (the "Project"). Hypower contracted with ICSP to serve as surety for the construction bond as required for such projects by the Miller Act. Thus, ICSP is entitled to assert any and all claims and/or defenses which could be asserted by Hypower.

7.      On or about January 14, 2015, Paquin sued ICSP as Hypower's surety in this court, asserting a "Miller Act Claim" based on the facts to be described herein concerning work performed on the Project. For suits under the Miller Act, mandatory venue lies in the district and division in which the project is located. Hypower is contractually obligated to defend and indemnify the Surety in this suit.

8.      ICSP, as the Surety on the project, has already tendered its defense to Hypower. The Miller Act claim arose from Crider's alleged failure to pay Paquin for work that Paquin allegedly performed on the Project. Under the terms of the blanket subcontract agreement between Crider and Hypower, Crider is obligated to protect, defend, indemnify, and hold harmless Hypower with respect to claims for which Hypower may be found liable, e.g., the Miller Act Claim.

**B.      Crider's Scope of Work on the Project**

9.      On or about August 27, 2013, Crider Americas Solar, LLC ("Crider") entered into a written subcontract (the "Subcontract") with Hypower under which Crider agreed to provide design and engineering services and to furnish labor and materials necessary to install solar car port structures (the "Work") on the Project. In exchange for Crider's performance of the Work, Hypower agreed to pay Crider the sum of $1,489,500.00.[1]

10.     Under Article II of the Subcontract, Crider was required to strictly follow the Project's progress schedule, and any failure to adhere to any portion of the progress schedule and its subsequent revisions constituted a material breach of the Subcontract.[2] The Subcontract states that Crider is liable to Hypower for any costs incurred as a result of Crider's delay or failure to maintain the Project schedule, including costs for supervision, overhead, insurance, Project

---

[1] A true and correct copy of the Subcontract is attached as Exhibit "1"
[2] *See* Exhibit "1," Art. II, para. 2.  A true and correct copy of the progress schedule is attached as Exhibit "2."

facilities, time penalties imposed by governmental entities, and liquidated damages imposed by the Project's owner.[3] Article III of the Subcontract states that "[t]ime is of the essence in this Agreement."[4]

11.    Article XVI of the Subcontract prohibited Crider from assigning any monies becoming due under the Subcontract without the prior written consent of Hypower.[5] Hypower gave no prior consent to Crider's assignment of its accounts receivable or the sale of its invoices. As such, under Article XVI, any assignment or sale of Crider's accounts receivable or invoices vests no right or action in the assignee against Hypower.[6]

12.    Article X of the Subcontract, which entitles Hypower to withhold from payments otherwise due to Crider, states the following:

> Should [Crider] at any time refuse or neglect to supply a sufficiency of skilled workmen or materials of the proper quality and quantity, or fail in any respect to prosecute the Work with promptness and diligence, or tend to cause by any action or omission the stoppage or delay of or interference with the work of [Hypower] or of any other subcontractors on the Project, or fail in the performance of any of the agreements on its part contained herein, or become bankrupt or insolvent or go into liquidation either voluntarily or under an order of a court of competent jurisdiction or make a general assignment for the benefit of creditors or otherwise acknowledge insolvency, [Hypower] shall be at liberty (but without obligation), after three (3) days written notice to [Crider], mailed or delivered to the last known address of the latter, to provide through itself or through others, any such labor or materials, and to deduct the cost thereof from any money due or thereafter to become due to [Crider] under this Agreement; and [Hypower] shall also be at liberty (but without obligation) to terminate the employment of [Crider] for the said Work and to enter on the Project and take possession, for the purpose of completing the Work, of all materials, tools and appliances thereon, and to employ any other person or persons to finish the Work, and to provide materials therefore.
> . . .
> In case of such termination of the employment of [Crider], [Crider] shall not be entitled to receive any further payment under this Agreement until the said Work shall be wholly finished, at which time, if the unpaid balance of the amount to be

---

[3] *See* Exhibit "1," Art. II, para. 3.
[4] *Id.* Art. III, para 3.
[5] *See id.* Art. XVI, para. 1.
[6] *See id.*

paid under this Agreement shall exceed the expense incurred by [Hypower] in finishing the said Work, such excess shall be paid by [Hypower] to [Crider]; but, if such expense shall exceed such unpaid balance, then [Crider] shall pay the difference to [Hypower].  The expense incurred by [Hypower] shall include the cost of furnishing materials and of finishing the Work, plus any damage incurred by the default of [Crider].

. . .

[Hypower] may permit [Crider] to continue to work in spite of [Crider's] default; however, such continuation shall not be construed as a waiver of [Crider's] obligations or responsibility for default hereunder.  Upon request by [Hypower], [Crider] shall furnish such evidence as [Hypower] may require concerning [Crider's] ability to perform this Agreement in the manner and time specified."[7]

13.     Throughout the course of its performance of the Work, Crider had problems meeting the requirements of the Subcontract. Specifically, Crider was unable to adhere to the Project's progress schedule or to timely pay its vendors and sub-subcontractors, as required by the Subcontract. Because Crider failed to adhere to the progress schedule, Hypower issued to Crider a notice of default on December 16, 2013. The notice of default cited numerous defaults, including: (1) Crider's failure to meet the December 15, 2013, deadline for completion of the Work; (2) Crider's failure to submit certified payroll reports through December 7, 2013, which is required on projects for the Veterans Administration; (3) Crider's failure to submit a recovery schedule, as required by the Subcontract; (4) Crider's failure to submit a corrective action plan for defective welds associated with the structural steel delivered to the Project site; (5) Crider's failure to submit required welder certifications; (6) Crider's failure to submit required OSHA Weekly Safety Tailgate Meeting reports; and (7) Crider's failure to timely pay its sub-subcontractors and vendors, which subjected Hypower to threats of liens and claims. The notice of default concluded by allowing Crider three days within which to submit to Hypower an acceleration and recovery plan, including completion dates and resources demonstrating Crider's ability to deliver the remaining materials and timely complete the remaining Work without

---

[7] *See id.* Art. X, paras. 1-3.

additional expenses to Hypower, and to submit all documentation required to cure the defaults discussed above.[8]

14.     With the hope that Crider would cure its defaults and mitigate the consequences of its failures to perform, Hypower continued to communicate and work with Crider for approximately one month after the date of the notice of default. However, Crider failed to cure its defaults and failed to submit the required information. In fact, Crider failed to submit any type of plan or to perform corrective and recovery work as needed. Hypower was left with no choice but to terminate the Subcontract and move forward without Crider.

15.     Under Article VI.G. of the Subcontract, Hypower has discretion to make progress or final payments in the form of checks payable jointly to Crider and its creditors, including sub-subcontractors and materials suppliers.[9] After Crider was terminated, Hypower received sworn statements of account from Crider's sub-subcontractors and suppliers. Some of those sub-subcontractors and suppliers were also parties to three-party joint check agreements with Crider and Hypower. Hypower requested that Crider either consent to the payment requested by each sub-subcontractor and supplier or object to such payment and document the basis for its objection or defense to the amount included in each sworn statement of account. With the exception of the sworn account of Paquin, Crider did not object or offer a defense to any payment requested by any of its sub-subcontractors or suppliers. In an effort to keep the Project moving forward, Hypower paid Crider's sub-subcontractors directly, as allowed under the terms of the Subcontract.

16.     On or about January 27, 2014, DSCH Capital Partners, LLC d/b/a Far West Capital ("Far West") filed a lawsuit against Hypower in the 345th Judicial District Court of the

---

[8] A true and correct copy of the notice of default is attached as Exhibit "3."
[9] *See* Exhibit "1," Art. VI.G.

6

State of Texas, County of Travis. In its original petition, Far West alleged that Hypower failed to pay Crider for the balances on four invoices which Far West had purchased from Crider. However, under Article VI.E. of the Subcontract, in the event Hypower became aware of any claim which, if established, could expose Hypower or the Project's owner to liability, Hypower was entitled to withhold from payment to Crider an amount sufficient to completely secure itself and the Project's owner for any loss or damage which either may sustain in discharging such claim.[10] Additionally, under Subcontract Article VI.G., if Hypower received notification from any sub-subcontractor or supplier that Crider had failed to timely pay any indebtedness for labor, materials, services, equipment, benefits, or the like, Hypower was entitled to pay the amount of any such claimed liability and recover the amount from Crider.[11] Accordingly, based on Articles VI and X of the Subcontract, Hypower was entitled to withhold from payments otherwise allegedly due to Crider the funds used by Hypower to pay Crider's sub-subcontractors and suppliers, amounts representing costs incurred by Hypower because of Crider's delays to the Project schedule, and amounts representing costs incurred by Hypower to remediate Crider's deficient Work.[12]

17.     Under Article III, in the event Crider caused any delays in the progress of the Work which caused damage to Hypower, Crider was required to "protect, indemnify, defend, and hold Hypower harmless, for all liability, responsibility, obligation, costs, attorney's fees incurred through all levels of proceedings, claims or demands arising therefrom."[13] Crider's failure to adhere to the progress schedule caused the overall Project to be late, which in turn

---

[10] *See id.* Art. VI.E.
[11] *See id.* Art. VI.G.
[12] *See id.* Arts. VI, X.
[13] *See id.* Art. III, para. 3.

caused Hypower to incur significant unplanned costs, including extended general conditions and exposure to liability for liquidated damages assessed by the Project's owner.

18.     Because the expense incurred by Hypower to finish the Work, together with the damages suffered by Hypower as a result of Crider's breaches, exceeds the unpaid balance on the Subcontract, Crider owes Hypower damages within the jurisdictional limits of this Court and which will be proven at the time of trial. Hypower owes nothing to any claimant seeking money through Crider's contractual rights, as the money has already been spent correcting and completing the work of Crider and its subcontractors, including Paquin.

**B.     Far West's Communications with Hypower**

19.     On or about October 3, 2013, Hypower received an e-mail message from Crider's manager, Harold D. "Casey" Marshall, Jr. ("Marshall"). In the e-mail, Marshall told Hypower that "John Center from Far West Capital will be calling you shortly to confirm the validity of the attached invoice as part of our lending process."

20.     While working on the Project site, Hypower's project manager received approximately five telephone calls from representatives of Far West. During those telephone calls, a representative from Far West would read to Hypower's project manager a series of questions designed to solicit certain responses from the project manager without adequately explaining to him the nature of the inquiries or even mentioning that he was allegedly waiving any rights available to Hypower in the Subcontract, including Hypower's right to any offset or to otherwise withhold payment from Crider as provided by the terms of the Subcontract. Far West's line of questions was designed to deceive Hypower's project manager into allegedly waiving rights available to Hypower under the Subcontract. Far West recorded each of these phone calls

but never mentioned to the project manager that the calls were being recorded. Upon receiving the desired responses to its questions, the Far West representative would end the call.

21.     More importantly, Far West never informed Hypower's project manager that Far West (1) believed there was a contract between Far West and Hypower, (2) was seeking rights as an assignee of Crider, or (3) was going to lend specific amounts of money to Crider through the purchase of Crider's invoices.

## C.    Paquin's Involvement with Crider

22.     Unbeknownst to Hypower at the time, on or about November 1, 2013, Crider entered into a subcontract with Paquin (the "Crider/Paquin Subcontract"), under which Paquin agreed to perform the labor component of Crider's scope of work on the Project.[14] The Crider/Paquin Subcontract stated that "[Paquin] shall be paid $2,500 per week for (14) weeks beginning the week of October 14th."[15]

23.     In addition to subcontracting with Crider under his DBA entity, Armadillo Construction, John Paquin also served as a Project superintendent for Crider. In his capacity as Crider's superintendent, Paquin represented to Hypower that Crider (and Armadillo) performed Crider's scope of work in compliance with the terms of the Subcontract and related documents. However, Crider's work on the Project was defective and untimely. Because Paquin subcontracted with Crider to perform the labor component of Crider's scope of work, Paquin bears a large portion of the blame for the defective and untimely nature of such work.

24.     Crider generated Purchase Order #1348, in the amount of $227,857.18 and dated December 5, 2013, which listed Paquin as the vendor.[16] On or about January 16, 2014, Hypower sent Paquin an e-mail message which indicated that Crider had been terminated from the Project

---

[14] A true and correct copy of the Crider/Paquin Subcontract is attached as Exhibit "4."
[15] *Id.* p. 2.
[16] A true and correct copy of Crider Purchase Order #1348 is attached as Exhibit "5."

and requested that Paquin complete and return to Hypower an attached Sworn Statement of Account form as soon as possible.[17]

25.     Paquin submitted to Hypower a Sworn Statement of Account form, dated January 17, 2014, which indicated that: (1) Paquin already had been paid the amount of $50,000.00, (2) the amount of $130,000.00 was presently due to Paquin, and (3) the amount of $47,000.00 would become due after the date of January 17, 2014.[18] Hypower paid the $50,000.00 through a joint check, dated January 8, 2014, issued to Crider and Paquin.

26.     On or about January 21, 2014, Hypower sent to Crider an e-mail with Paquin's Sworn Statement of Account attached.[19] In the e-mail, Crider was informed that Hypower had received the sworn statement from Paquin and that Crider was obligated to defend and indemnify Hypower against such claims. Hypower requested a response from Crider within 72 hours notifying Hypower of any objection or defense to the amounts claimed by Paquin.

27.     On or about January 22, 2014, Crider sent Hypower its response to Paquin's Sworn Statement of Account.[20] In its response, Crider acknowledged that the amended price of the Crider/Paquin Subcontract was $227,000. However, Crider refused to agree to the amounts contained in Paquin's Sworn Statement of Account because Crider maintained that Paquin failed to account for certain items that were to be deducted from the contract in accordance with the scope of the agreement. Crider indicated that the following amounts should have been deducted from any balance allegedly owed to Paquin: (1) any withholdings, chargebacks, liquidated damages or charges from Hypower to Crider as a result of the incomplete Paquin scope of work, which had to be completed by others; (2) any withholdings, chargebacks, liquidated damages or

---

[17] A true and correct copy of Hypower's January 16, 2014, e-mail to Paquin is attached as Exhibit "6."
[18] A true and correct copy of Paquin's Sworn Statement of Account form is attached as Exhibit "7."
[19] A true and correct copy of Hypower's January 21, 2014 e-mail to Crider is attached as Exhibit "8."
[20] A true and correct copy of Crider's response to Paquin's Sworn Statement of Account is attached as Exhibit "9."

charges from Hypower to Crider as a result of Paquin not providing adequate and accurate reporting as required in the Crider/Paquin Subcontract; (3) any withholdings, chargebacks, liquidated damages or charges from Hypower to Crider as a result of damages to the Project site or personal property of others; (4) any valid/active claims for wages or payments due to lower-tier subcontractors of Paquin for labor and/or materials provided to the Project on behalf of Paquin; (5) charges for rental equipment generated by Paquin; and (6) costs incurred by Armadillo Construction, Paquin, and Daniel Prosise on Crider's debit cards for which accurate and approved expense reports with supporting receipts and documentation had not been submitted. Based on Crider's objection to Paquin's Sworn Statement of Account, Hypower did not issue further payment to Paquin.

28.     On or about January 14, 2015, Paquin sued Hypower's surety, Insurance Company of the State of Pennsylvania (the "Surety"), in this suit (the "Miller Act Claim"). On February 24, 2015, ICSP filed its original answer.

29.     Hypower is contractually obligated to indemnify and defend the Surety in the Miller Act Claim, and ICSP  has thus already tendered its defense to Hypower. The Miller Act claim arose from Crider's alleged failure to pay Paquin for work that Paquin allegedly performed on the Project. Under the terms of the blanket subcontract agreement between Crider and Hypower, Crider is obligated to protect, defend, indemnify, and hold harmless Hypower with respect to claims for which Hypower may be found liable, *e.g.*, the Miller Act Claim.

## ICSP'S COUNTERCLAIMS AGAINST PAQUIN

### Fraud

30.     Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

31.     As the Surety for Hypower, ICSP specifically reserves all rights to assert any claims that Hypower has or may have.

32.     In his roles as Crider's superintendent and labor subcontractor, Paquin represented to Hypower that Crider's scope of work had been performed in compliance with the applicable contract documents.

33.     Such representations were material, as Hypower relied on the representations in issuing payment to both Crider and Paquin. Hypower would not have issued such payments had the representations not been made by Paquin. Based on these representations, Hypower was forced to correct and complete Crider's and Paquin's work.

34.     These representations were false, as Crider's and Paquin's scopes of work were not performed in compliance with the Project's plans and specifications, and the scopes of work did not adhere to the Project's progress schedule.

35.     As the individual responsible for overseeing the labor component of Crider's scope of work, Paquin either knew that the representations were false, or he made the representations recklessly, as a positive assertion, and without knowledge of their truth.

36.     Paquin made these representations with the intention that Hypower act upon them. Paquin knew that Hypower would be unwilling to pay for work that was not in compliance with the contract documents.

37.     Hypower did, in fact, rely on Paquin's representations in issuing payment to Crider and to Paquin, and relied on those representations when they moved forward with Crider prior to the subsequent notice of default and termination in January of 2014.

38.     Hypower was injured by Paquin's representations in an amount to be proven at trial.

## Negligent Misrepresentation

39.    In his roles as Crider's Project superintendent and subcontractor, Paquin represented to Hypower that Crider's and Paquin's scopes of work had been performed in compliance with the contract documents. Crider's and Paquin's scopes of work were not performed in compliance with the contract documents.

40.    Paquin supplied these representations to Hypower as guidance for Hypower's determination of whether to issue payment for Crider's and Paquin's scopes of work.

41.    Paquin failed to exercise reasonable care or competence in obtaining or communicating this information to Hypower.

42.    Hypower justifiably relied on such representations in issuing payment for Crider's and Paquin's scopes of work on the project, and relied on those representations when they moved forward with Crider prior to the subsequent notice of default and termination in January of 2014.

43.    Because Hypower was forced to correct the deficient work and then complete the remaining scope of work, Paquin's negligent misrepresentations proximately caused Hypower injury in an amount to be proven at trial.

## ICSP'S THIRD-PARTY CLAIMS AGAINST CRIDER AND FAR WEST

### Breach of Contract

44.    Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

45.    As the Surety for Hypower, ICSP specifically reserves all rights to assert any claims that Hypower has or may have.

46.    By entering into the Subcontract, Crider agreed to prosecute the Work in a timely manner, to adhere to the Project's progress schedule, and to perform the Work in compliance with the Subcontract documents.

47.     Further, by entering into the Subcontract, Crider agreed not to assign any monies coming due under the Subcontract.

48.     By (1) failing to adhere to the Project's progress schedule and to complete the Work by December 15, 2013; (2) failing to perform the Work in compliance with the Project documents; (3) failing to cure the items listed in the December 16, 2013, notice of default; and (4) assigning its accounts receivable and/or selling its invoices to Far West, Crider materially breached the terms of the Subcontract.

49.     Crider's material breaches of the Subcontract were the proximate cause of Hypower's incurrence of significant damages for which Hypower seeks recovery. The amount of Hypower's damages will be proven at trial.

## Indemnity and Contribution

50.     Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

51.     As the Surety for Hypower, ICSP specifically reserves all rights to assert any claims that Hypower has or may have.

52.     In the suit filed in Texas, Far West has asserted claims against Hypower for breach of contract, fraud, negligent misrepresentation, promissory estoppel, and money had and received.

53.     In the Miller Act Claim pending in this suit, Paquin seeks to recover from the Surety amounts allegedly owed to Crider under the Crider/Paquin Subcontract.

54.     In violation of the Subcontract's anti-assignment clause, Crider assigned its accounts receivable to Far West without the prior written consent of Hypower.

55.     After assigning its accounts receivable to Far West, Crider failed to prosecute the Work and materially breached the Subcontract, causing Hypower to incur significant costs which

14

entitled Hypower to withhold sums from payments to Crider and which are now being claimed by Far West in the Texas suit.

56.     Hypower and ICSP are also entitled to indemnity from Crider based on the claims asserted by Far West. The Subcontract agreement, Article XX, provides that Crider shall indemnify, defend, and hold Hypower harmless "from all claims, losses, demands, causes of action and the like (including attorney's fees, expert witness fees and all dispute procedure costs), which may be asserted against [Hypower] or its Surety by anyone other than [Crider], and resulting from or occurring in connection with the failure of [Crider], or any party for whom [Crider] is responsible, to perform all Work required within the scope of this Subcontract in strict accordance with the Subcontract and Contract Documents."[21] Hypower has already been forced to retain counsel in defending the claims brought by Far West and which have been alleged to arise through the Subcontract.

57.     Hypower and ICSP are further entitled to indemnity from Crider based on the claims asserted by Paquin in the Miller Act Claim. Crider entered into the Crider/Paquin Subcontract, under which the Miller Act Claim has arisen. Hypower is contractually obligated to defend and indemnify the Surety in the Miller Act Claim. In turn, Crider is obligated under the Subcontract to indemnify Hypower against claims of nonpayment asserted by parties like Paquin who Crider hired to provide labor and to oversee the performance of labor on the Project. Hypower and ICSP are entitled to the same indemnity from Far West as the assignee of invoices and the remaining subcontract balance.

58.     To the extent that Far West is able to prove its claims against Hypower and is awarded any damages or other relief against Hypower, and to the extent that Paquin is able to prove its claims against the Surety and is awarded any damages or other relief for which

---

[21] *See id.* Art. XX, para 1.

Hypower must provide indemnification, Hypower would show that it is entitled to indemnity and contribution from Crider.

## Fraud

59.     Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

60.     Throughout the course of its time on the Project, Crider represented to Hypower that it performed its work in compliance with the contract documents. For example, Crider submitted to Hypower applications and certifications for payment (the "Pay Apps"). In each of the Pay Apps, Crider certified "that to the best of the [Crider's] knowledge, information and belief the Work covered by this Application for payment has been completed in accordance with the Contract Documents and that current payment shown herein is hereby submitted for payment per the terms of the Subcontract Agreement."

61.     These representations were material in that Hypower would not have agreed to pay Crider had it known at the time that the work performed by Crider failed to comply with the contract documents. Hypower also would not have moved forward with Crider prior to the subsequent notice of default and termination in January 2014.

62.     These representations were false because Crider's work failed to comply with the contract documents or to adhere to the Project's progress schedule.

63.     When Crider made these representations, it knew that the representations were false, or it made the representations recklessly, as positive assertions, and without knowledge of their truth.

64.     Crider intended for Hypower to act on the representations. Crider knew that in order to receive payment, Hypower required assurances that Crider's scope of work had been performed in compliance with the contract documents.

65.     Hypower did, in fact, rely on Crider's representations in deciding to issue payment to Crider, and move forward with Crider prior to the subsequent notice of default and termination in January of 2014.

66.     Hypower was injured as a result of Crider's representations in an amount to be proven at trial.

### Fraud by Nondisclosure Against Crider

67.     Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

68.     Crider failed to disclose to Hypower that it was selling any of its Project invoices and/or accounts receivable to Far West or that Far West would attempt to collect balances allegedly due to Crider as Crider's assignee. Crider failed to disclose the true and complete nature of its relationship with Far West, nor did Crider disclose who the ultimate beneficiary of Hypower's payments would be.

69.     Crider had a duty to disclose these facts, as Crider had represented in the Subcontract that it would not assign any monies coming due under the agreement, which created a substantially false impression with Hypower that Crider would comply with the representation.

70.     Crider withheld material facts, as Hypower would have objected to the sale of Crider's invoices and/or the assignment of its accounts receivable had Crider disclosed these facts to Hypower. Hypower would not have entered into the Subcontract had it know of Crider's relationship with Far West.

71.     At the time the parties entered into the Subcontract, and at relevant times thereafter, Crider knew that Hypower was ignorant as to Crider's relationship with Far West, and Crider knew that Hypower did not have an equal opportunity to discovery such relationship. Crider knew that Hypower was unaware (1) that Crider had already entered into a purchase

agreement with Far West; (2) that Far West's telephone calls would be used to support Far West's allegations that Hypower waived its rights under the Subcontract; (3) that Far West was acting as an assignee of Crider based on Far West's purchase of Crider's Project invoices and accounts receivable; (4) that Far West was buying Crider's invoices for any specified amounts or that Far West expected to be paid with funds received from Hypower's payment; or (5) that Far West believed that there was some type of contractual relationship between Hypower and Far West. Crider knew that Hypower was not in an equal position to discover such facts.

72.     Crider was deliberately silent regarding its relationship with Far West, as Crider knew that its disclosure of the relationship would alert Hypower to Crider's financial instability.

73.     By failing to disclose these facts to Hypower, Crider intended to induce Hypower to enter into the Subcontract and to continue to work with Crider after the parties entered into the Subcontract.

74.     Hypower relied on Crider's nondisclosure by agreeing to enter into the Subcontract and continuing its relationship with Crider after work commenced on the Project.

75.     By acting without knowledge of these facts, Hypower and ICSP have suffered injury including Hypower's exposure to liability in this case and the Texas suit. In addition, Hypower has been forced to correct and complete Crider's and Paquin's defective and incomplete work, which Hypower would have avoided had it not entered into the Subcontract with Crider. The amount of Hypower and ICSP's damages will be proven at the time of trial.

**Fraud by Nondisclosure Against Far West**

76.     Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

77.     During its telephone calls to Hypower's project manager, Far West failed to disclose to the project manager the true nature of the inquiries or that he was allegedly waiving

any rights available to Hypower in the Subcontract, including Hypower's right to any offset or to otherwise withhold amounts from payment to Crider as provided by the terms of the Subcontract.

78.     Far West had a duty to disclose these facts to Hypower because Far West made a partial disclosure that left a false impression in the mind of Hypower's project manager. Far West informed Hypower's project manager that Far West sought to "confirm" invoices, but never informed the project manager that he was allegedly waiving any of Hypower's rights under the Subcontract or that the calls were being recorded to be used later to claim that Hypower waived such rights.

79.     A duty to disclose the whole truth arises when some information voluntarily has been disclosed.[22]

80.     These facts were material, as Hypower's project manager never would have agreed to waive Hypower's rights under the Subcontract if Far West would have disclosed that he was allegedly waiving such rights.

81.     In addition, Far West knew that Hypower was unaware (1) that Crider had already entered into a purchase agreement with Far West; (2) that the telephone calls would be used to support Far West's allegations that Hypower waived its rights under the Subcontract; (3) that Far West was acting as an assignee of Crider based on Far West's purchase of Crider's Project invoices and accounts receivable; (4) that Far West was buying Crider's invoices for any specified amounts; or (5) that Far West believed there was some type of contractual relationship between Hypower and Far West. Far West knew that Hypower was not in an equal position to discover such facts.

---

[22] *La. Civ. Code art. 1953*

82.     Far West was deliberately silent with regard to these facts because it knew that if such facts were disclosed, Hypower's project manager would have been alerted to the true nature of the phone calls and would not have agreed to "confirm" Crider's invoices.

83.     By failing to disclose these facts to Hypower's project manager, Far West sought to quickly obtain Hypower's supposed "confirmation" of Crider's invoices, record such "confirmation," and then promptly end the calls.

84.     Hypower relied on Far West's nondisclosure by not objecting to the confirmation calls and continuing to communicate with Far West, which enabled Far West to continue to induce Hypower to act in a way that it would not have acted if all of the facts had been disclosed by Far West.

85.     Hypower has been injured as a result of acting without the full knowledge of the undisclosed facts, as Hypower has been exposed to liability in this lawsuit and in the Miller Act Claim, and has allegedly waived rights that it possessed under to the terms of the Subcontract. The amount of Hypower's damages will be proven at the time of trial.

## PREJUDGMENT AND POST-JUDGMENT INTEREST

86.     Each of the foregoing paragraphs is incorporated as if specifically set forth herein.

87.     Hypower is further entitled to an award of pre- and post-judgment interest in this action at the maximum rate allowed by law against Paquin, Crider, and Far West.

## CONDITIONS PRECEDENT

88.     All conditions precedent to Hypower's right to recover the relief requested herein have occurred or been performed.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Third-Party Plaintiff and Counterclaimant, ICSP, prays that upon final hearing:

A.  The Court enter judgment in favor of ICSP as the Surety of Hypower, and against Paquin, Crider, and Far West on all claims set forth in this Third-Party Complaint and Counterclaim, and that Hypower be awarded its actual (direct and consequential) damages as established at trial;

B.  That, to the extent ICSP as the Surety of Hypower is found to be liable to Paquin in this Miller Act Claim, Crider and/or Far West be required to provide indemnification and contribution to Hypower and ICSP;

C.  That ICSP be awarded pre- and post-judgment interest on the amounts owed to Hypower and ICSP at the highest rate allowed by law;

D.  That ICSP recover its reasonable attorney fees and costs as allowed by law; and

E.   That ICSP be granted such other and further relief to which it may be justly

entitled.

Respectfully submitted,

*/s/ Richard E. King*

**RICHARD E. KING (#25128)**
**JENNIFER L. SIMMONS (#30060)**
**GALLOWAY, JOHNSON, TOMPKINS,**
**    BURR & SMITH**
701 Poydras Street, Suite 4040
New Orleans, Louisiana  70139
Telephone: (504) 525-6802
Facsimile:  (504) 525-2456
***Counsel for Defendant, Counterclaimant,***
*** and Third Party Plaintiff, Insurance Company of***
***the State of Pennsylvania. Inc.***

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on the 11th day of March, 2015, undersigned electronically

filed the foregoing with the Clerk of Court by using the CM/ECF system which will send notice

of electronic filing to all counsel of record.

*/s/ Richard E. King*

**RICHARD E. KING**